New York City Omnibus Corporation v. Commissioner.
New York City Omnibus Corp. v. Commissioner
Docket No. 2757.
United States Tax Court
1946 Tax Ct. Memo LEXIS 187; 5 T.C.M. (CCH) 396; T.C.M. (RIA) 46121; May 23, 1946
Charles C. Parlin, Esq., and Paul R. Russell, Esq., for the petitioner. Thomas H. Lewis, Jr., Esq., for the respondent. MURDOCK
Memorandum Opinion MURDOCK, Judge: The Commissioner determined deficiencies in the petitioner's income tax for the years 1936 to 1939, inclusive. The Commissioner moved the Court to sever the issues and to hear and determine first the issue of what, as a matter of law, is the proper basis (unadjusted) to be used in computing a reasonable allowance for depreciation of *188 the petitioner's franchise to operate omnibuses in the city of New York. That motion was granted. The parties were heard upon the issue thus severed. They filed a stipulation of facts and introduced other evidence. The Commissioner, in determining the deficiency, allowed a deduction for depreciation computed by using a basis of $7,087,784.85 for the bus franchise. He filed and amended answer claiming an increased deficiency on the ground that the proper basis for the franchise is not in excess of $1,300,941. The petitioner first claims a basis in excess of $24,000,000 upon the theory that the basis of its predecessor, Railways Corporation, for its street railway franchises carried over and became a part of the petitioner's basis for the bus franchise. It contends, in the alternative, for a basis of about $13,000,000 upon the theory that the cost of the bus franchise to it was a proportionate part of the total of the value of its own stock issued to Railways Corporation, plus the indebtedness of Railways Corporation assumed by it. It is essential to both of these contentions that Railways Corporation first owned the bus franchise and transferred it to the petitioner in 1936. The *189 respondent contends that the petitioner acquired the bus franchise directly from the city of New York and that its basis is cost. We do not understand from the record just how the respondent would compute that cost. It is unnecessary at this time to review completely the long history of the transportation system now being operated by the petitioner. The city had granted a number of street railway franchises. Many of those were in perpetuity and some were for the lives of the corporations to which they were granted. The separate transportation routes were eventually consolidated into a comprehensive system of longitudinal and cross-town street railway lines in the Borough of Manhattan. The operation of that business was not always successful. A number of changes, foreclosures, receiverships, and reorganizations took place. Railways Corporation became the operating company for the entire system in 1925. The use of motor buses in place of electric street cars had been under consideration even before 1925. The petitioner was organized in 1925 for the purpose of making applications for bus franchises. Railways Corporation owned all of its 10 shares of stock. Potential competitors were *190 also applying for bus franchises in the Borough of Manhattan. The city desired to recapture the perpetual and other indeterminateterm street railway franchises, to have the tracks and other unsightly equipment removed from the streets, and to have buses substituted for the dangerous and inade quate street car system. It did not intend to grant any perpetual bus franchises but desired to have a comprehensive bus operation for the entire Borough under a single franchise. It intended to obtain the best bargain that it could. The city finally decided that its best interests would be served by dealing with the petitioner and Railways Corporation. Both Railways Corporation and the city desired to have the petitioner own and operate the bus franchises in preference to the Railways Corporation because of the unfavorable financial condition of the latter. The petitioner made application for bus franchises covering practically all of the streets and routes upon which Railways Corporation was operating street cars and the petitioner also applied for franchises covering other streets and routes not included in Railways Corporation's transportation system. The franchise here in question was eventually *191 granted to the petitioner under a contract with the city dated December 26, 1933, which provided that the petitioner should be granted the privilege of operating omnibuses over nine routes, substantially the same as the routes then in use by Railways Corporation in the operation of its electric street railway system, and granting to the petitioner, in addition, the privilege of operating omnibuses over four new cross-town routes. This single franchise was for a term of twenty-five years. The petitioner was required under the contract to pay to the city 3 per cent of the gross revenues from the operation of the nine old routes and 10 per cent of the gross revenues from the four new routes. Another contract was entered into at the same time between the city and the petitioner, Railways Corporation, and various affiliated corporations. It was provided under these contracts that Railways Corporation would abandon all of the franchises covering its entire street railway system and would obtain the approval of the New York State Transit Commission for the abandonment of those lines. It was further provided that all this should be done and that the omnibuses should be in full operation within *192 18 months. Other provisions of the agreements important hereto were that Railways Corporation would remove certain of its equipment from the streets, would assign to the city its property rights in certain other equipment such as the tracks, and would pay to the city $160,000 in cash in lieu of removing the latter equipment from the streets. The use of the franchise was dependent upon the fulfilment of all of the above agreements. Railways Corporation, in the early part of 1934, filed with the Transit Commission a plan for the readjustment and motorization of the street railway lines in the Borough of Manhattan. A competitor started litigation to prevent the petitioner from obtaining its bus franchise under the arrangements outlined above. This litigation delayed the parties in carrying out the above-described arrangements, and the petitioner, in January 1935, entered into a supplemental contract with the city for an extension of the time within which to place the bus transportation system in operation. The city, as a condition of granting this extension, required the petitioner to give the city an option to elect after ten years to terminate the bus franchises and acquire the properties *193 of the bus system at various prices fixed in the agreement. The litigation was finally terminated favorably to the petitioner in January 1935, and on March 19, 1935, a revised plan of readjustment and motorization of Railways Corporation through a 77-B reorganization was announced to its security holders. Railways Corporation, in accordance with that revised plan, filed a petition in July 1935 for its reorganization under section 77-B of the Federal Bankruptcy Act. The Court held that Railways Corporation was insolvent. Its capital and indebtedness had to be drastically reduced. The petitioner was to assume certain indebtedness of Railways Corporation, was to cancel its 10 outstanding shares of stock held by Railways Corporation, and was to issue about 500,000 shares of stock by exchanging 458,450 of those shares for certain properties of Railways Corporation which would be useful in the operation of the bus system, and by selling the remainder to certain security holders at $17.50 per share. The petitioner, in January 1936, had obtained the necessary authority from the Transit Commission to operate buses over the routes covered by its franchise from the city, and it began in *194 the early part of 1936 to substitute its bus service for parts of the street car transportation system being operated by Railways Corporation. Railways Corporation advanced funds to the petitioner for the purchase of equipment and for other purposes. The petitioner was made a party to the 77-B proceedings in March 1936. The Court required the petitioner to operate the substituted bus routes for the account of Railways Corporation and to hold the proceeds for such disposition as the Court might direct until the various steps involved in the 77-B proceeding could be completed. It required the petitioner and Railways Corporation to enter into contracts to this effect as buses were substituted for street cars on various routes. The last of these substitutions was made in the late spring of 1936. The plan of reorganization of Railways Corporation was finally approved by the Court in June 1936, and the debtor was directed to abandon the street railway franchises. The bus franchise and other properties of the petitioner were subjected at that time to certain indebtedness of Railways Corporation, and the Court directed "that until further order of this Court the franchise routes of the Bus *195 Company which correspond to the street railway routes of the Debtor shall be held by the Bus Company for the benefit and protection of the Trustee and the bondholders" and the entire capital stock of the bus company (petitioner) was to be held for the benefit and protection of creditors and stockholders of Railways Corporation as the Court might direct. Railways Corporation filed a declaration of abandonment of its street railway franchises with the Secretary of the State of New York on June 10, 1936. The approval of the Transit Commission of the abandonment of the street car franchises was conditioned upon the actual substitution of the bus system for the street car system. The operation of buses on the four new crosstown routes commenced during the month of June 1936. The conversion of the transportation system to a bus system was completed about that time. The city, on November 13, 1936, consented to having the bus franchise pledged to secure the indebtedness of Railways Corporation. Railways Corporation transferred its operating properties to the petitioner on December 24, 1936 in exchange for stock of the petitioner. The instruments effecting this transfer contain statements *196 that Railways Corporation and its security holders and creditors transferred to the petitioner all of its interests, rights, and claims in the bus routes. The original 10 shares of the petitioner's stock were surrendered and cancelled at that time. Earnings of the petitioner for the period from February 12 to October 31, 1936, amounting to $594,776.28, were paid over to Railways Corporation in December, and earnings for the period from November 1 to December 24, amounting to $148,952.81, were paid over to a nominee of Railways Corporation in December 1936. The above were the entire net earnings of the petitioner for those periods. The 77-B proceeding was terminated on July 23, 1937. The parties refer for statutory authority to the Revenue Act of 1936. The general rule of section 113 (a) of that Act is that the basis of property shall be its cost. The respondent's position is that the petitioner acquired the bus franchise directly from the city of New York and the basis of that franchise in the hands of the petitioner is its cost. The petitioner argues, however, that Railways Corporation was the owner, or at least the beneficial owner, of the bus franchise prior to December *197 1936 and the petitioner held legal title only, as nominee of Railways Corporation, until the final transfer in December, at which time Railways Corporation transferred the bus franchise to the petitioner, either in exchange for stock or as a contribution to capital or surplus. It suggests also that if Railways Corporation was not the beneficial owner of the bus franchise then its creditors were, and the result is the same. The petitioner argues that the basis of the street car franchise in the hands of Railways Corporation carries over under such circumstances and becomes a principal part of the basis of the bus franchise in the hands of the petitioner under exceptions (7) and (8) of section 113 (a). The first of those exceptions provides that, if property was acquired by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, adjusted for gain or loss. The part of exception (8) upon which the petitioner relies is that, if property was acquired by a corporation as paid-in surplus or a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, adjusted for gain or *198 loss. The petitioner also mentions section 112 (b) (1) which provides that no gain or loss shall result where property held for productive use is exchanged solely for property of a like kind held for productive use. It argues in this connection that the street railway franchises were exchanged for the bus franchise, the two were like property and both were held for productive use so that the basis remains the same under 113 (a) (6). It argues in the alternative that the bus franchise was exchanged for stock of the petitioner and the assumption by the petitioner of the indebtedness of Railways Corporation, so that the cost of the bus franchise was a portion of the sum of the indebtedness assumed plus the value of the petitioner's stock issued for all of the assets of Railways Corporation. The respondent contends that all of these arguments of the petitioner are unsound since the bus franchise was never owned by and never had any basis in the hands of Railways Corporation or its creditors; it certainly did not have as its basis in their hands the basis of the old street railway franchises; neither Railways Corporation nor its creditors transferred the bus franchise to the petitioner; *199 and consequently, the basis of the old street car franchise is not carried over to the petitioner under any of the provisions mentioned by the petitioner and, furthermore, there is no factual basis for the petitioner's theory for computing the cost of the bus franchise to the petitioner. It is apparent that all of the contentions of the petitioner are based upon the alleged fact that Railways Corporation (or its creditors) was the owner of the bus franchise and transferred it to the petitioner. Those contentions must all fail if, in fact, the petitioner acquired both legal title and a substantial part, or all, of the equitable ownership in the bus franchise directly from the city of New York. The city did not grant the bus franchise to Railways Corporation, but, for reasons important both to the city and to those interested in Railways Corporation, granted the franchise directly to the petitioner with the intention on the part of all that the bus franchise would be owned and operated by the petitioner. A part of the consideration which the city demanded for the bus franchise was the agreement by the petitioner that it would pay certain percentages of the gross revenues from the operation *200 of the bus lines to the city. This part of the consideration was furnished by the petitioner and not by Railways Corporation. The city also demanded and obtained from the petitioner an option to recapture the bus franchise and to acquire the bus system after the elapse of at least ten years. Railways Corporation, the principal if not the sole stockholder of the petitioner, also furnished a part of the consideration for the bus franchise. The most important part of the consideration furnished by Railways Corporation was the surrender by it to the city of the street railway franchises. This was perhaps the most important consideration for the bus franchise. The petitioner, under the general plan, was to acquire all of the assets of Railways Corporation which would be useful to it in the operation of the bus lines and was to issue some of its new stock for those properties. It was to assume indebtedness of Railways Corporation. The latter was to supply capital to the petitioner. The acquisition of the bus line and the motorization of the transportation system, including the reorganization of Railways Corporation under section 77-B of the Bankruptcy Act, involved many complications. *201 It was not possible to take all of the steps involved in the plan at one time. It was not practical to operate the street car transportation system up to a certain day and then substitute a complete bus transportation system on the following day. Approval had to be obtained for the various steps from the Court, from the state authorities, and from the city. Bus equipment had to be obtained and personnel trained. Changes from street cars to buses were made on individual routes at various dates during the first six months of 1936. The bus transportation system was in complete operation at the end of that period. The street car franchises were still being held and at least one car was in operation on each street car line in order to hold those franchises until the bus system was complete. The franchises were then surrendered. The remaining properties of Railways Corporation were transferred to the petitioner in exchange for its stock in December 1936, and the whole plan was virtually completed. The Court required the petitioner, during this transition period, to account to Railways Corporation for the proceeds of operating the bus lines as they were substituted for old street car lines. *202 It might fairly be said that, to that extent, Railways Corporation had a beneficial interest in a part of the bus franchise owned by the petitioner. The necessities of the situation required those temporary arrangements in order to protect the beneficial owners of Railways Corporation until the reorganization could be completed, at which time those beneficial owners of Railways Corporation would be secured by the stock and assets of the petitioner. Since the petitioner had been required to account to Railways Corporation for the operation of some or all of the bus lines, it was no doubt fitting and proper to recite in the instruments under which the assets of Railways Corporation were eventually transferred to the petitioner, that the beneficial interest in the bus franchise of Railways Corporation and its creditors was transferred to the petitioner so that thereafter there could be no question of the complete title of the petitioner in the bus franchise. The evidence shows, however, that Railways Corporation never was and never was intended to be either the legal or beneficial owner of the entire bus franchise. Even though it was given the benefit of the operation of the bus lines *203 for the transition period, nevertheless, it never acquired full beneficial interest in the bus franchise, never had a basis for the full beneficial interest in the bus franchise, and never transferred the full beneficial interest in the bus franchise to the petitioner. Of course, it never had legal title to the bus franchise. The transactions in this case do not fit into sections 113 (a) (7), (8) or 112 (b) (1) so as to carry the basis for the old street car franchises over to the bus franchise in the hands of the petitioner. Those sections, as the petitioner recognizes, are intended to cover situations where the owner of property exchanges it or transfers it directly to another taxpayer which then continues to hold that same property. Here there was no such transfer or exchange. If Railways Corporation had some partial beneficial interest in the bus franchise which it transferred to the petitioner in December 1936, the interest transferred did not carry with it to the petitioner the bases for the old street car franchises. The old street car franchises were not surrendered to the city solely for the purpose of obtaining for Railways Corporation the transitory beneficial interest *204 in the bus franchises mentioned above. The chief, if not the entire purpose of surrendering those street car franchises was in consideration of the grant by the city of a long-term franchise to the petitioner which the latter was to hold for its term and use as its own. The statutory provisions relied upon by the petitioner for carrying over the old basis do not apply for the reasons already discussed and, consequently, it is unnecessary to consider whether or not there are other reasons why the transactions do not come within those provisions. Since none of the exceptions of section 113 (a) applies, the basis of the bus franchise in the hands of the petitioner is its cost, as provided in the general rule of (a). The petitioner's theory that it acquired the bus franchise from Railways Corporation by assuming indebtedness of Railways Corporation and issuing its stock to Railways Corporation is unsound for reasons which are already apparent, that is, because the bus franchise was not acquired by the petitioner in that way. While some beneficial interest in the bus franchise may have been transferred by Railways Corporation to the petitioner in exchange for its stock, nevertheless, *205 as indicated above, that was far from complete equitable ownership in the bus franchise. Other assets of Railways Corporation having a very substantial value were obviously the chief consideration given in exchange for the petitioner's stock and the assumption by the petitioner of certain indebtedness of Railways Corporation. The acquisition of the bus franchise was only one of the steps involved in the general plan for reorganizing Railways Corporation and motorizing the transportation system. All of the transactions involving Railways Corporation and the petitioner were closely related and were for the purpose of bringing about the final result. We have had all of those circumstances in mind and yet we conclude from the entire record that the bus franchise was acquired by the petitioner directly from the city, with the petitioner furnishing a part of the consideration and Railways Corporation contributing the balance. This contribution by Railways Corporation for the benefit of the petitioner in its efforts to acquire the bus franchise may not be regarded as having been made in exchange for the stock of the petitioner but must be regarded as merely a capital contribution by a stockholder *206 to the petitioner corporation. Furthermore, the petitioner's basis is the full cost of the bus franchise, whatever that was, regardless of the fact that Railways Corporation may have had some beneficial interest in the franchise for a short time in 1936. It was always intended that the petitioner should have full beneficial interest in the bus franchise, and it acquired the above-mentioned fragment of beneficial interest before the whole transaction was completed. Thus, whatever basis, if any, Railways Corporation may have had for that partial beneficial interest, was transferred to the petitioner. Section 113 (a) (7) or (8). It is only necessary to add the various considerations paid in order to determine the cost and the basis of the bus franchise to the petitioner. The record indicates that the parties are not necessarily in disagreement as to the determination of cost under this method. It seems clear that they are in agreement as to some, if not all, of the items going into this cost. It is not our desire to interfere in so far as the parties may be in agreement as to any of these items. The agreement on the part of the petitioner to pay a percentage of gross income annually *207 was a part of the cost of the franchise. Other parts of the cost of the bus franchise were the value of the street car franchises surrendered by Railways Corporation, the value of the street car tracks and other equipment which it turned over to the city of New York, and the $160,000 which it paid to the city of New York. It appears that the petitioner expended additional amounts to acquire or protect the bus franchise. The cost may include other items. The parties are directed to file computations under Rule 50 or otherwise move in respect of the case on or before July 31, 1946.